```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA

                       Alexandria Division

HALIMEH HAMDAN,                )
                              )
        Plaintiff,            )
                              )
            v.                )     1:05cv779(JCC)
                              )
SM CONSULTING, INC.,          )
                              )
        Defendant.            )
```

**M E M O R A N D U M   O P I N I O N**

      This matter comes before the Court on Defendant's motion for summary judgment.  For the following reasons, the Court will grant Defendant's motion.

**I.  Background**

      Plaintiff, Halimeh Hamdan, has filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), against Defendant, SM Consulting, Inc. ("SMC").  SMC, which interviews, hires, and assigns linguists on behalf of the Defense Intelligence Agency ("DIA"), hired Plaintiff as a linguist on or about March 15, 2004.  Plaintiff is over the age of forty and of Palestinian descent.  After Plaintiff completed her training in Virginia, she began her assignment in Qatar at Camp As Sayliyah.  Plaintiff's colleagues at Camp As Sayliyah included military

-1-

personnel, SMC employees, and other civilian personnel who were
not employees of SMC.

On July 22, 2004, SMC terminated Plaintiff.
Thereafter, Plaintiff obtained a similar position with STG, a
different government contractor, who terminated her in March of
2005.  Plaintiff then obtained a position with MPRI, a third
government contractor, who terminated Plaintiff in May of 2005.
On July 1, 2005, Plaintiff filed this action against SMC,
alleging that she was subjected to a hostile work environment,
because of her national origin and her age, during the time she
worked for SMC.  Plaintiff also claimed that after she made
complaints about the allegedly hostile work environment to SMC
management, SMC engaged in a series of retaliatory actions by
terminating her and conveying information that resulted in her
terminations from STG and MPRI.

The details of Plaintiff's complaints to SMC employees
are not in dispute.  On or about June 14, 2004, Plaintiff
reported to Richard Godfrey, SMC's acting Site Manager at Camp As
Sayliyah, about an incident in which two non-SMC personnel moved
their chairs next to Plaintiff and attempted to get as
physicially close to Plaintiff as possible during a translation
skills test.  Plaintiff told Godfrey that the individual in
charge of testing translation skills, also a non-SMC employee,
directed the two to sit next to Plaintiff in order to determine

-2-

whether she could perform under pressure.  Plaintiff further informed Godfrey that George Apiea, a night shift supervisor who also was not a SMC employee, told Plaintiff on another occasion that "we have already gotten rid of one PLO [Palestinian Liberation Organization] and we are looking to get rid of another."[1]  (Def.'s Mem. Ex. 3, at 2.)  Plaintiff assumed that Apiea was referring to her since she is of Palestinian descent.

Because the alleged conduct was committed only by non-employees of SMC, Godfrey reported Plaintiff's allegations to Staff Sergeant Melanie Deumeland, the point-of-contact for SMC-related work at Camp As Sayliyah.  Deumeland stated that Plaintiff would have to submit the allegations in writing in order to commence an investigation.  Godfrey relayed this information to Plaintiff, but Plaintiff never submitted a written complaint.  Accordingly, no investigation was conducted.  (See Def.'s Mem. Ex. 3, at 2.)

A subsequent complaint made by Plaintiff about her working conditions prompted a meeting with Frank O'Donnell on or about June 29, 2004.  O'Donnell was the SMC Site Manager who replaced Godfrey at Camp As Sayliyah.  According to O'Donnell's affidavit, the complaints that preceded the meeting addressed a

---

[1]In Plaintiff's deposition, she testified that Apiea indicated that he was joking at the time he made the PLO comment.  (See Def.'s Mem. Ex. 4, at 146-47.)  As for the other "PLO" referred to by Apiea's comment, Plaintiff testified that this individual, Mr. Nadar, was ostensibly terminated for sexual harassment.  (See id. at 126-33.)

-3-

variety of issues, including Plaintiff's shift assignment, the personalities of her supervisor and coworkers, and her general working conditions.  O'Donnell found that Plaintiff frequently used the term "harassment" to dismiss constructive criticism from her supervisors and coworkers.  At no point did Plaintiff complain to O'Donnell about conduct relating to her national origin or age.  The meeting itself was prompted by Plaintiff's attempt to bypass the chain of command to complain about a critique of her work, and O'Donnell advised Plaintiff that similar disruptions in the future could result in her termination.

On or about July 17, 2004, Dennis Courtney and Jason Kozlowski met with Plaintiff to discuss her complaints.[2] Courtney and Kozlowski informed Plaintiff that she needed to follow the chain of command to address her complaints.  They found Plaintiff to be argumentative and advised Plaintiff that her attitude needed improvement.  Although they found Plaintiff to have a complaint regarding almost every facet of her employment, Plaintiff did not make any complaints about treatment relating to her age or national origin.  Courtney and Kozlowski scheduled a follow-up meeting with Plaintiff for July 20, 2004.

---

[2]SMC assigned Courtney and Kozlowski to travel to Qatar for the purpose of conducting performance reviews of approximately fifty SMC employees who were assigned to work as DIA linguists at Camp As Sayliyah.  Upon the completion of their evaluations, Plaintiff received one of the lowest ratings of all of SMC's employees in Qatar, and Plaintiff had the lowest rating of all for "attitude."

Before the follow-up meeting, Courtney and Kozlowski received reports of Plaintiff's repeated failure to cooperate with her coworkers.  At the July 20, 2004 meeting, Plaintiff responded to these reports by claiming that each of her coworkers were the problem, and she refused to accept responsibility for her poor working relationships.  According to Courtney, Plaintiff "commented that she had a problem with her black coworkers, because black employees 'always stick together.'"  (Def's Mem., Ex. 1, at 3.)  Courtney and Kozlowski observed that Plaintiff exhibited a contentious, argumentative, and difficult personality, and they concluded that SMC's continued employment of Plaintiff would damage SMC's business relationship with the DIA and impair the level of coworker camaraderie at Camp As Sayliyah.  Courtney and Kozlowski subsequently advised Plaintiff that they intended to meet with her on July 22, 2004 at 1:00 p.m. for the purpose of conducting her formal performance review.

On the morning of July 22, 2004, Courtney and Kozlowski met with Petty Officer Albert Williams, the government employee who supervised Plaintiff.  Williams told the two that Plaintiff "was an argumentative, highly contentious employee who did not get along well with her coworkers or her supervisors."  (Def.'s Mem., Ex. 1, at 4.)  Williams presented Courtney and Kozlowski with two complaints written about Plaintiff's conduct by her coworkers.

-5-

Plaintiff failed to appear for her scheduled performance review.  After waiting approximately one hour, Courtney and Kozlowski proceeded to her living quarters for the purpose of immediately terminating her employment.  Upon arrival at Plaintiff's residence, they knocked on the door and requested to speak to Plaintiff.  Plaintiff refused to come to the door, and Kozlowski placed his foot inside the door, advised Plaintiff that her employment had been terminated, and required her to immediately turn over her security badge and other government-issued items.[3]

In the early part of 2005, STG hired Plaintiff to work as a linguist for the DIA, and she reported to Bolling Air Force Base ("Bolling") for orientation.  The orientation was overseen by Jim Brady, a SMC employee who was responsible for quality control for the approximately twenty-four linguists performing document exploitation services for the DIA at Bolling.  Brady's job duties included providing orientation to new employees, assigning work stations, escorting employees to avoid secured areas, and advising his DIA supervisor regarding the quality of the linguists' work.  The linguists under Brady's oversight were

---

[3]According to the affidavits submitted by Courtney and Kozlowski, Courtney remained outside Plaintiff's residence at all times during the conversation, and Kozlowski kept one foot outside the residence at all times.  Although Plaintiff disputes this account and claims that the two entered her living quarters without permission, she has not submitted any affidavits or other evidence to substantiate her claim.

employed by as many as five different employers, including both STG and SMC.

Although Brady was a SMC employee, he was unaware of Plaintiff's prior employment history with SMC at the time she reported for orientation. Nevertheless, according to his affidavit, Plaintiff immediately distinguished herself as a "'problem' employee," (Def.'s Mem. Ex. 7, at 2), as Brady found her to be unfamiliar with basic keyboard functions of a computer, such as the "space" key and the "delete" key. In the following days, Plaintiff twice entered secure areas of the facility in spite of warnings she had received that the areas were off-limits to linguists. She also repeatedly sought assistance from other linguists in the performance of her responsibilities, which resulted in delays in the fulfillment of duties for both Plaintiff and the other linguists.

Brady reported each of these concerns to Lieutenant Georgina Baez, the Branch Deputy. Within days of Plaintiff's assignment to Bolling, the DIA instructed STG to terminate Plaintiff's employment, and STG complied. Plaintiff contends that she observed Brady speaking to Michael Courtney, SMC's Vice President of Operations, on the day preceding her termination, and she argues that Courtney influenced Brady's reports to the DIA officials. According to Brady's affidavit, however, he did

not learn that Plaintiff had left SMC on unfavorable terms until after her termination by STG.

After STG terminated Plaintiff, she applied for a linguist position with MPRI, a third government contractor that offers linguistic services on behalf of the DIA.  In or about the month of May, 2005, Dan Sullivan, a MPRI employee, telephoned Michael Courtney to obtain reference information about Plaintiff. Courtney, who knew Sullivan and had worked with him in the past, advised Sullivan that SMC did not customarily give out information regarding prior employees.  Sullivan responded that he was attempting to resolve a dispute regarding the reason for Plaintiff's departure from SMC.  Specifically, the DIA advised MPRI that Plaintiff had been terminated involuntarily by SMC, while Plaintiff contended that she had quit SMC's employment.  In response, Courtney informed Sullivan "that SMC had not (and would never) give out false information to their mutual client (*i.e.*, the DIA), and, advised Mr. Sullivan that, with respect to this issue, MPRI could believe the DIA."  (Def.'s Mem. Ex. 8, at 2.) Following this conversation, MPRI terminated Plaintiff's employment.

Based on this series of events, Plaintiff has filed the instant action, alleging that she was subjected to a hostile work environment at SMC in violation of Title VII and the ADEA. Plaintiff also alleges that after she filed complaints about the

hostile work environment with SMC management, SMC retaliated against her by terminating her employment and by taking measures that resulted in her termination from two other positions.  SMC has filed a motion for summary judgment on all claims.  This motion is currently before the Court.

## II.  Standard of Review

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of fact exists if a reasonable jury could return a verdict for a nonmoving party.  *See id.*  In other words, summary judgment appropriately lies only if there can be but one

-9-

reasonable conclusion as to the verdict. *See id.* As the Fourth

Circuit explained,

> [W]e must draw any permissible inference from the
> underlying facts in the light most favorable to the
> party opposing the motion. Summary judgment is
> appropriate only where the record taken as a whole
> could not lead a rational trier of fact to find for the
> non-moving party, such as where the non-moving party
> has failed to make a sufficient showing on an essential
> element of the case that the non-moving party has the
> burden to prove.

*Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)

(citations omitted), *abrogated on other grounds in Hazen Paper*

*Co. v. Biggins*, 507 U.S. 604 (1993).

### III.  Analysis

A.  Hostile Work Environment Based on National Origin

Title VII provides that it shall be an unlawful

employment practice for an employer to discriminate against any

individual with respect to compensation, terms, conditions, or

privileges of employment because of such person's national

origin.  *See* 42 U.S.C. § 2000e-2(a)(1).  An employee's work

environment is a term, condition, or privilege of employment.

*Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir.

2000).  To demonstrate a hostile work environment prohibited by

Title VII, Plaintiff must demonstrate that she was the subject of

conduct that was: (1) unwelcome; (2) based on her national

origin; (3) sufficiently severe or pervasive to alter the

conditions of employment and create an abusive atmosphere; and

that (4) there is some basis for imposing liability on the employer.  *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).

The only conduct alleged by Plaintiff that related to her national origin was George Apiea's comment that "we have already gotten rid of one PLO and we are looking to get rid of another."  (Def.'s Mem. Ex. 3, at 2.)  Assuming that this comment was unwelcome, it is simply not sufficient to constitute a hostile work environment in violation of Title VII.

In determining whether unwelcome, national origin-based conduct is so severe or pervasive as to create a hostile work environment, a court must look at the totality of the circumstances.  Relevant circumstances include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance."  *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000).  In this case, the discriminatory conduct occurred on only one occasion, and by an individual who was not even employed by SMC.  There is no evidence that the comment was severe, physically threatening, or humiliating; indeed, according to Plaintiff's deposition testimony, Apiea indicated that he was joking at the time he made the comment.  There is likewise no indication that it interfered

in any way with Plaintiff's job performance.  Accordingly, the alleged conduct was neither severe nor pervasive and could not have created a hostile work environment.

Finally, there is no basis for imposing liability on SMC.  In the context of a sexual harassment case, the Supreme Court has adopted the following test for vicarious liability in hostile work environment claims:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.  The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).[4]  *See also Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995) ("Liability [for national origin harassment] may be imputed to the employer if the employer had actual or constructive knowledge of the existence of a hostile working environment and took no prompt and adequate remedial action.").

Here, after Plaintiff reported Apiea's comment to Richard Godfrey, SMC's acting site manager, Godfrey referred the

---

[4]As noted, this affirmative defense is only available when no tangible employment action is taken.  The Fourth Circuit has explained that "[t]angible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense."  *Lissau v. S. Food Serv.*, 159 F.3d 177, 182 (4th Cir. 1998).  Although SMC terminated Plaintiff's employment, as will be discussed below, there is no evidence that this employment action was taken for discriminatory or retaliatory reasons.

allegations to Staff Sergeant Melanie Deumeland, the point-of-contact for SMC-related work at Camp As Sayliyah.  Deumeland informed Godfrey that Plaintiff would have to submit the allegations in writing in order to commence an investigation, and Godfrey relayed this information to Plaintiff.  Because Plaintiff did not submit a written complaint, no investigation was conducted.  (*See* Def.'s Mem. Ex. 3, at 2.)  As SMC exercised reasonable care to investigate any possible harassing behavior, and because Plaintiff unreasonably failed to take advantage of the potential investigative avenues, there is no basis for imputing liability to SMC.

B.  Hostile Work Environment Based on Age

        The ADEA provides that it is unlawful for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such person's age.  *See* 29 U.S.C. § 623(a)(1).  As stated above, an employee's work environment is a term, condition, or privilege of employment.  *Smith*, 202 F.3d at 241.  Again, to establish a hostile work environment, Plaintiff must demonstrate that the offending conduct was: (1) unwelcome; (2) based on her age; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer.  *See Spriggs*, 242 F.3d at 183-84.

-13-

It is difficult to elucidate from Plaintiff's filings the events that Plaintiff believes are indicative of age discrimination.  Based on Plaintiff's complaint, deposition, and the documents filed in opposition to the instant motion, it appears that Plaintiff's claim is premised on a series of events surrounding her birthday.  In Plaintiff's deposition, she stated that on her birthday, her supervisor asked Plaintiff her age. Plaintiff claimed that her supervisor later isolated Plaintiff from her coworkers.  When Plaintiff complained about this incident to Dennis Courtney and Jason Kozlowski, Courtney reportedly told Plaintiff that she was "living in a bubble" and that she should look for another job.  (Def.'s Mem. Ex. 4, at 169.)

It is unclear how the isolation of Plaintiff from her coworkers and Courtney's subsequent comment were based on Plaintiff's age at all, except for the fact that these events occurred on her birthday.  This fact alone does not convert Plaintiff's myriad of complaints about her relationships with her coworkers into an age discrimination claim.  In any event, Plaintiff has not alleged the degree of severe and pervasive conduct necessary to support a claim for hostile work environment based on her age.

Conduct is not actionable unless it is both subjectively and objectively offensive, such that a reasonable

-14-

person would find it hostile or abusive and that the victim in fact did perceive it to be so.  *See Faragher*, 524 U.S. at 787. In this regard, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Id.* at 788 (internal quotation marks and citation omitted).  An inquiry on Plaintiff's birthday about her age is simply not the type of conduct that a reasonable person would find hostile or abusive.  As for the remainder of the incident, even upon assuming that it was based on Plaintiff's age, the Court finds that the conduct was isolated and lacking in severity.  Accordingly, summary judgment will be granted on Plaintiff's hostile work environment claims.

C.  Retaliation

        To state a prima facie case for retaliation, a plaintiff must show that: 1) she engaged in a protected activity; 2) the employer took an adverse action against her; and 3) a causal connection existed between the protected activity and the claimed adverse action.  *Labor v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).  After the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the action, under the oft-cited *McDonnell Douglas* analysis.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Price v. Thompson*, 380 F.3d

209, 212 (4th Cir. 2004).  If the employer does so, the plaintiff must demonstrate that the employer's proffered reasons are pretextual.  *Price*, 380 F.3d at 212.

Plaintiff has alleged three incidents in which she believes SMC retaliated against her for her hostile work environment complaints.  In each case, Plaintiff's claim rests on a premise that the complaints she made to other SMC employees at Camp As Sayliyah constituted protected activity.  SMC has submitted ample evidence showing, however, that the vast majority of Plaintiff's complaints centered merely on her perceived mistreatment when she received constructive criticism from supervisors and coworkers.  These complaints did not constitute "protected activity" within the meaning of Title VII's retaliation provisions.  *See Balazs v. Liebenthal*, 32 F.3d 151, 159-60 (4th Cir. 1994) (holding that an employee's complaint alleging conduct not prohibited by Title VII was not protected activity).  The only complaint that related to a possibly unlawful act of discrimination occurred when Plaintiff complained to Richard Godfrey about George Apeia's "PLO" comment.  Thus, Plaintiff can only state a prima facie case with respect to acts of retaliation that occurred because of this particular complaint.

### 1.  Plaintiff's Termination from SMC

The first alleged act of retaliation occurred when SMC terminated Plaintiff from its employment at Camp As Sayliyah. Clearly, SMC took an adverse action against Plaintiff when it terminated her, and SMC has not presented evidence to refute the existence of a causal link between Plaintiff's complaint and the adverse action.  Even upon assuming the existence of Plaintiff's prima facie case, however, SMC has cited a plethora of legitimate, non-retaliatory reasons for Plaintiff's termination. The affidavits, correspondence, and other records produced by SMC reveal that Plaintiff's period of employment with SMC was a contentious one, in which she repeatedly lodged complaints regarding normal aspects of her working relationships, frequently traversing the chain of command to do so.  After making inquiries with Plaintiff's coworkers and conducting a performance evaluation, Dennis Courtney and Jason Kozlowski both concluded that Plaintiff was uncooperative, disruptive, and that her attitude was poor.  Finally, on the day of her termination, Plaintiff failed to report for her formal performance review.

Each of these facts gave way to a legitimate, non-retaliatory reason for Plaintiff's termination.  Plaintiff has submitted correspondence showing that she maintained good relationships with various other coworkers, as well as evidence showing that she performed well in positions she held previous to

-17-

her time with SMC.  Plaintiff's burden, however, is to demonstrate that the reasons proffered by SMC for her termination are pretextual.  Plaintiff has not done so, and thus her first claim for retaliation must fail.

### 2.  Plaintiff's Termination from STG

The second act of retaliation alleged by Plaintiff occurred when STG terminated her from its employment.  Plaintiff claims that SMC fabricated negative information about her and shared this information with STG, thus causing her termination. In this instance, SMC challenges the existence of Plaintiff's prima facie case.

To state a prima facie case of retaliation, Plaintiff must establish a causal connection between the protected activity and the claimed adverse action.  *See Labor*, 438 F.3d at 432. "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).  In this case, Jim Brady, the individual whose report led to Plaintiff's STG termination, has submitted an affidavit stating that he was unaware of Plaintiff's prior work history with SMC until after her termination from STG's employment.

-18-

Plaintiff's attempts to prove that her STG termination resulted from an act of retaliation are telling.  She argues that she witnessed Brady speaking to Michael Courtney, SMC's Vice President of Operations, on the day preceding her termination. Plaintiff infers that Courtney somehow encouraged Brady to report negatively on Plaintiff's job performance.  This notion is based on nothing more than unsupported speculation and conjecture, however, and it is further belied by the previous positions Plaintiff has taken in this litigation.

In Plaintiff's opposition to the instant motion, she concedes that Brady was initially unaware of her prior employment with SMC.  In her interrogatory answers, Plaintiff stated that Michael Courtney came into her workplace at Bolling only the day before her termination.  In Plaintiff's deposition, however, she testified that "Mr. Brady, James Brady, was picking on me from the beginning."[5]  (Def.'s Reply Ex. 1, at 201.)  Plaintiff does not dispute the fact that Brady made complaints about her prior to the date on which Courtney appeared at her Bolling workplace. This demonstrates that Brady's concerns with Plaintiff's job performance were consistent from the outset of her employment,

---

[5]In Plaintiff's opposition to SMC's summary judgment motion, she contends that Brady began to treat her differently and "pick on" her immediately after Michael Courtney left her workplace at Bolling.  Not only is this contention unsworn, but it also directly contradicts Plaintiff's earlier deposition in which she testified that Brady "was picking on" her from the outset of her employment with STG.  As such, the Court will disregard the position taken in Plaintiff's opposition papers.

refuting the notion that SMC and Michael Courtney subsequently took action that led to Plaintiff's termination from STG.  By all accounts, Brady's concerns were legitimately based on several incidents in which Plaintiff demonstrated her unfamiliarity with basic computer keyboard functions, entered secured areas without authorization in spite of warnings given to her, and disrupted the workplace by seeking assistance in her duties.

In sum, Brady has testified that he was unaware of Plaintiff's history with SMC until after STG terminated her, and Plaintiff has offered only unsupported speculation to refute this testimony.  The evidence before the Court is entirely consistent with Brady's account and flies in the face of any possible causal link between Plaintiff's STG termination and any action taken by SMC.  As such, Plaintiff has not stated a prima facie case for retaliation based on her termination from STG's employment.

### 3.  Plaintiff's Termination from MPRI

The third act of retaliation alleged by Plaintiff occurred when Michael Courtney confirmed the DIA's account to MPRI that Plaintiff had been terminated from SMC's employment. Plaintiff had previously told MPRI that she quit her position with SMC, and when Courtney advised MPRI that the DIA was correct, Plaintiff was terminated from MPRI's employment.  In this instance, SMC has not presented any evidence to refute the existence of an adverse action or a causal link.

-20-

Upon assuming the existence of Plaintiff's prima facie case, it is nevertheless clear that her third claim for retaliation must fail. MPRI's request for information arose when the DIA disputed Plaintiff's representation that she had quit her position with SMC. According to the affidavit of Michael Courtney, "[t]he DIA was, and is, a valued client of SMC, and SMC would never under any circumstances avoid the opportunity of offering assistance to its client by verifying the credibility of the DIA, especially as it relates to the DIA's relationship with SMC." (Def.'s Mem., Ex. 8, at 2.) Thus, verifying the DIA's account enhanced SMC's business relationship with the DIA. Most importantly, the information shared by Courtney was true. As such, SMC has cited a legitimate, non-retaliatory reason for informing MPRI that Plaintiff was terminated. Plaintiff has not presented any evidence showing that the proffered reason was pretextual. As such, summary judgment on Plaintiff's third retaliation claim is appropriate.

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment. An appropriate Order will issue.


July 7, 2005                            _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                                UNITED STATES DISTRICT COURT JUDGE